ORIGINAL

FILED
OCT - 2 2006
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

GENERAL INJECTABLES & VACCINES, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 06-683 C

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff General Injectables & Vaccines, Inc. ("Plaintiff" or "GIV"), through its undersigned counsel, files this Complaint for Declaratory and Injunctive Relief against Defendant United States of America, acting by and through the Centers for Disease Control and Prevention ("CDC"). Plaintiff seeks a declaratory judgment that CDC's decision to override a pre-contract-award stay issued pursuant to the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553(c)(1), was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law. Plaintiff also seeks a court order enjoining Defendant and the contract awardee, McKesson Specialty Distribution, LLC ("McKesson"), from beginning or continuing contract performance until the Government Accountability Office ("GAO") has ruled on GIV's pending bid protest.

## JURISDICTION

1. This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1).

## PARTIES

2. Plaintiff General Injectables & Vaccines, Inc. is a licensed wholesale distributor of pharmaceuticals and medical supplies. GIV is a Virginia corporation with its principal place of business at 80 Summit View Lane, Bastian, Virginia 24314.

3. Defendant is the United States of America, acting by and through the Centers for Disease Control and Prevention, which is headquartered at 1600 Clifton Road, NE, Atlanta, Georgia 30333. CDC is an operating component within the United States Department of Health and Human Services.

## STATEMENT OF FACTS

### *The Vaccines For Children And Section 317 Grant Programs*

4. In 1993, Congress enacted a program for the distribution of pediatric vaccines, commonly known as the Vaccines for Children program ("VFC"). *See* Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103–66, § 13631, 107 Stat. 312, 636-43 (codified at 42 U.S.C. §§ 1396a(a)(62) and 1396s).

5. The VFC provides federally purchased vaccine to certain eligible children (e.g., children that are uninsured or Medicaid-eligible). *See* 42 U.S.C. § 1396s(b)(2)(A).

6. Eligible children may not be charged for the cost of vaccines covered by the VFC. § 1396s(a)(1)(A). In addition, federal law requires that vaccines covered by the VFC be supplied to participating health care providers free of charge. § 1396s(a)(1)(B).

7. Through a second program, commonly known as the section 317 grant program because it was established under section 317 of the Public Health Service Act, 42 U.S.C. § 247b, project grants are provided for preventive health services including immunization programs.

8. Section 317 funds are intended to help grantees maintain immunization infrastructures or purchase vaccines not covered by private insurance or not available through the VFC.

9. Participants in the section 317 grant program currently include sixty-four state, local and territorial immunization programs.

10. Under the VFC, the federal government negotiates purchase contracts with vaccine manufacturers. *See* 42 U.S.C. § 1396s(d)(1). States/projects may then purchase vaccine at the federally negotiated price through the federal contracts.

11. States develop and operate programs designed to ensure effective delivery of vaccine to eligible children. Thirty of the sixty-four states/projects outsource vaccine distribution to a third-party distributor. GIV has provided vaccine distribution services to almost ninety-three percent of the states/projects that use a third-party distributor.

12. GIV has been a long-standing participant in the VFC program and has distributed publicly purchased vaccines for use by participating health care providers under contracts in up to twenty-eight states for over eleven years.

13. As the primary provider of vaccine distribution services to states/projects that use a third-party distributor, GIV currently ships tens of millions of doses of vaccine per year to VFC participants. In 2004, GIV distributed approximately twenty-eight million doses of vaccine. In 2005, GIV distributed approximately thirty-two million doses of vaccine. To date, GIV has shipped approximately twenty-six million doses of vaccine in 2006.

14. GIV's record of service has been unblemished and exemplary throughout its participation in the VFC program. For example, GIV has never been cited for a deficiency after review by CDC or participating state health departments during site inspections and/or audits.

15. Until the award of the contract to McKesson, GIV was one of only two distributors that held contracts to provide vaccine distribution services to state and municipal health departments under the VFC program. The other distributor was Bellco Drug Corporation, which has since expressed its intention to exit the VFC program.

***Procurement History***

16. In 2004, CDC determined that it would be more efficient to consolidate the vaccine distribution services provided under separate state contracts into one integrated system.

17. CDC relied on GIV to provide information in preparing a procurement that would achieve this consolidation. For example, GIV provided CDC with its "Detailed Shipment Analysis" for all shipments to VFC providers to ensure that CDC could provide potential bidders with accurate estimates for vaccine shipment sizes and number of doses under the consolidated contract. Organized by state/project, this analysis included the date of order, provider address and identification number, description of product shipped, number of orders and number of doses shipped per order for every VFC participant who was shipped vaccine by GIV.

18. On November 1, 2005, CDC issued Solicitation No. 2006-N-08248 (the "RFP") for a centralized vaccine distribution contract.

19. The solicitation sought offers for centralized receipt, storage and distribution of licensed vaccines under federal and non-federal contracts, as directed by CDC.

20. The RFP provided a timeline for states/projects to transition to centralized distribution. The implementation of centralized distribution would occur in three phases, starting with "pilot" sites in early 2006.

21. The original implementation timeline outlined by the RFP anticipated the transition for all three phases would not occur until late 2007.

22. The RFP provided that a project officer would begin performance no later than thirty days after the award of the contract.

23. The selection criteria notified potential bidders that cost would be a determinative factor only if all the technical and business proposals were deemed substantially equal.

24. The RFP informed all potential bidders that CDC would evaluate proposals using a "best value" analysis whereby the contract would be awarded to the bidder whose integrated proposal represented the best overall value to the federal government.

25. A bidder's integrated proposal included: (1) a Systems Security Plan to protect private health information; (2) technical and business proposal; (3) oral presentation; (4) final proposal revisions; (5) past performance; and (6) site visits by the CDC.

26. On June 6, 2006, GIV timely submitted its final proposal.

27. As required by the RFP, GIV included material estimates pertaining to the distribution of vaccine as well as vaccine stockpiling costs.

***GIV's Elimination From The Competitive Range***

28. On or about July 18, 2006, CDC informed GIV both orally and in writing that the company had been eliminated from the "competitive range" of qualified offers. The competitive range is comprised of the qualified offers rated highest by the contracting officer after comparing each proposal against the solicitation evaluation criteria.

29. CDC stated that while GIV's proposal was determined to be technically acceptable based on the evaluation criteria established in the RFP, the level of cost proposed resulted in GIV's exclusion from the competitive range.

### *The CDC Debriefing*

30. On July 18, 2006, GIV requested a pre-award debriefing by CDC pursuant to the Federal Acquisition Regulations subpart 15.505(e).

31. On July 20, 2006, CDC provided its written debriefing, which stated that GIV's technical proposals, business proposals and oral presentations were all acceptable. However, CDC reiterated that the level of cost proposed by GIV resulted in the company being excluded from the competitive range.

32. The debriefing document stated that CDC made an "affirmative decision that the remaining offeror(s) in the competitive range could perform the contract at the stated price."

### *GIV's Protest Before The GAO*

33. GIV filed a timely protest with the GAO on August 7, 2006, based on its exclusion from the competitive range.

34. GAO notified CDC of GIV's protest on August 8, 2006.

35. GAO's notification of CDC stayed any award of the contract under 31 U.S.C. § 3553(c)(1).

36. GIV filed a supplemental protest on August 25, 2006, alleging two technical panel members were improperly pressured to change GIV's technical scores.

37. Any change in a technical score would be prejudicial to GIV, where, according to a solicitation amendment, cost would only be a determinative factor if the bids were substantially equal from a technical perspective.

38. GAO subsequently informed counsel for GIV that GAO would render a decision on the bid protest and supplemental bid protest on November 16, 2006.

***CDC's Override Of The CICA Stay***

39. On September 12, 2006, CDC informed GIV that despite the company's pending protests, CDC had awarded the contract to McKesson.

40. The contract award should have been preceded by a Findings and Determination ("F&D") letter from CDC. Neither GAO nor GIV received the CDC's F&D explaining the reasons for overriding the statutory stay prior to the awarding of the contract to McKesson.

41. On the morning of September 13, 2006, counsel for GIV telephoned Mr. Paul N. Wengert, attorney for GAO, to inquire about CDC's decision to override the statutory stay and award the contract to McKesson in light of GIV's pending bid protests.

42. During that conversation, Mr. Wengert informed GIV's counsel that CDC authorized the awarding of the contract to McKesson before notifying GAO of CDC's decision to override the pre-award stay.

43. On September 13, 2006, counsel for GIV received a facsimile transmission from Mr. Wengert, which enclosed a copy of an April 9, 2004 letter from GAO General Counsel Anthony Gamboa to then-Secretary of Health and Human Services Tommy Thompson, advising the head of CDC's parent agency that CICA provided different legal standards for overriding a stay depending on whether the stay was issued before or after the contract was awarded. In that letter, Mr. Gamboa concluded that because the agency had applied the "best interests of the United States" standard instead of the "urgent and compelling circumstances" standard, two pre-award GAO protesters had been denied the "opportunity of meaningful relief."

44. On the same morning of September 13, 2006, counsel for GIV received a facsimile transmission from CDC counsel that contained the agency's F&D, which allegedly preceded CDC's decision to award the contract to McKesson.

45. Upon preliminary review by GIV's counsel, the F&D appeared to be legally insufficient because it was not signed by the agency's head of procurement activity, as required by 31 U.S.C. § 3553(c)(1).

46. Later in the morning of September 13, 2006, counsel for GIV received a second facsimile transmission from CDC counsel that contained CDC's F&D, though this latter version contained a signature page bearing the signature of the head of CDC's procurement activity. Aside from the additional signature page, the second F&D appeared to be identical to the first.

47. To support its override determination, CDC argued that circumstances did not permit waiting for the resolution of GIV's GAO protests prior to awarding the contract where any delay associated with the protest could have a "negative public health impact." F&D ¶ 7.

48. The F&D stated that this negative impact would result from the delay associated with the bid protest encroaching on transition timelines, which were developed in association with each immunization project. *Id.*

49. To support this conclusion, the F&D provided the expiration dates of multiple state contracts that were to be transitioned under the centralized vaccine distribution contract. *See* ¶¶ 7(A)-(C).

50. The F&D did not specifically address how waiting for the GAO decision on GIV's pending bid protests would have an impact on transitioning contracts set to expire over four months later (i.e., on March 31, 2007).

51. The F&D also failed to mention that GIV was in negotiations with the state of New Jersey to continue performance past the state contract's November 30, 2006 expiration date, a fact known by CDC because the agency had requested that GIV take over the contract. More

specifically, on March 31, 2006, GIV sent an e-mail to CDC agreeing to the agency's request to transition the New Jersey contract into the New York Multi-State contract held by GIV.

52. Instead, based on its "findings," CDC determined that awarding the contract to McKesson prior to GAO's determination of GIV's protests was in the "best interest of the Government[.]" F&D at 3.

53. On or about September 28, 2006, GAO dismissed GIV's initial bid protest; however, GIV's supplemental bid protest will still be decided on November 16, 2006.

**CAUSE OF ACTION**
**(Unlawful Override Of CICA Stay)**

54. Plaintiff incorporates by reference all allegations contained in paragraphs 1 through 53 above.

55. CDC's decision to override the pre-award CICA stay was invalid because (1) CDC's determination was not clearly premised on the correct legal standard, (2) the stated bases for CDC's decision were contradicted by the evidence before the agency, (3) CDC proffered no reasons why it was necessary that McKesson commence performance of the contract during the pendency of GIV's bid protests, (4) CDC's claim that the new contract might save it money cannot justify overriding a pre-award stay under CICA, and (5) CDC's determination failed to consider what would happen if GAO determined that the award to McKesson was illegal.

56. CDC's decision to override the CICA stay was therefore arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

57. As a direct and proximate result of CDC's decision to override the CICA stay, Plaintiff has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court enter an order:

A. Declaring that CDC's decision to override the pre-award CICA stay was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law;

B. Enjoining CDC and McKesson from beginning or continuing performance under the contract until GAO issues a determination on Plaintiff's pending bid protest;

D. Awarding Plaintiff attorneys' fees and reasonable expenses incurred in connection with this action; and

E. Such other relief as the Court deems just and proper.

Dated: October 2, 2006

Respectfully submitted,

By: ______________________

Mark J. Biros*
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 20004-2533
202.416.6800
202.416.6899 (fax)
mbiros@proskauer.com

*Attorney of Record for Plaintiff*
*General Injectables & Vaccines, Inc.*

* Application for admission to be filed in accordance with appendix C, paragraph 25 of the Rules of the United States Court of Federal Claims.

*Of counsel:*

Lawrence Z. Lorber
James F. Segroves
Meredith C. Bailey
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 20004-2533
202.416.6800
202.416.6899 (fax)

Gilbert J. Ginsburg
LAW OFFICES OF
GILBERT J. GINSBURG
1250 24th Street, NW
Suite 350
Washington, DC 20037
202.776.7772
202.776.7773 (fax)