IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

No. 06-683C (Bid Protest)
(Judge Bruggink)

---

GENERAL INJECTABLES & VACCINES, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

MCKESSON SPECIALTY DISTRIBUTION, LLC,

Defendant-Intervenor.

---

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND DECLARATORY RELIEF**

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

FRANKLIN E. WHITE, JR.
Assistant Director

DELISA M. SANCHEZ
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 616-0337
Facsimile: (202) 305-7643

OF COUNSEL:

ELISE HARRIS
Assistant Regional Counsel
U.S. Department of Health
and Human Services
61 Forsyth Street, S.W.
Suite 5M60
Atlanta, GA 30303

October 17, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

PAGE(S)

TABLE OF AUTHORITIES .......... iii

STATEMENT OF THE ISSUES .......... 1

STATEMENT OF THE CASE .......... 2

STATEMENT OF FACTS .......... 2

I. The CDC's Vaccine Distribution Program .......... 3

II. Solicitation No. 2006-N-0848 .......... 5

III. Proposals Pursuant To Solicitation No. 2006-N-0848 .......... 6

IV. GIV's Bid Protests At The GAO And The CDC's Override Of The CICA Stay Of Award .......... 9

SUMMARY OF THE ARGUMENT .......... 10

ARGUMENT .......... 10

I. Standard Of Review .......... 10

A. The Substantive "Arbitrary And Capricious" Standard .......... 10

B. The Standard For Preliminary Injunctive Relief .......... 12

II. This Court Should Not Award Injunctive Relief Without Consideration Of The Injunctive Factors .......... 13

III. GIV's Request For Preliminary Injunctive Relief Should Be Denied .......... 15

A. The CDC Applied The Correct Legal Standard In Overriding The Pre-Award Stay .......... 16

B. The CDC's Written F&D Is Rational And In Accordance With Applicable Law .......... 17

1. GIV Is Not An "Incumbent" And Has Never Had A Contractual Relationship With The CDC For The Nationalized Vaccine Distribution Function .......... 19

2. The CDC's Notification Of Contract Award To The GAO Is In Compliance With The Statutory Requirement .................... 19

3. The Written Findings Explain Why Cost Savings Support An Override Of The Stay .............................................. 20

4. The Written F&D Rationally Explains The Importance Of Implementing Awarding The Contract No Later Than September 8, 2006 ............................................................ 22

C. GIV Will Suffer No Specific, Irreparable Harm If The Stay Is Not Returned ........................................................................... 26

D. Any Harm Which Denial Of Injunctive Relief Would Cause To GIV Would Not Outweigh The Harm to The United States .............. 27

E. Issuance Of An Injunction Would Not Be In The Public Interest ........... 28

CONCLUSION .......................................................................................................... 33

# TABLE OF AUTHORITIES

## CASES

**PAGE(S)**

Advanced Data Concepts, Inc. v. United States,
216 F.3d 1054 (Fed. Cir. 2000) .......... 10, 11

Advanced Sys. Dev. v. United States,
72 Fed. Cl. 25 (2006) .......... 13

Automation Techs., Inc. v. United States,
2006 WL 2720642 (Fed. Cl. Sept. 11, 2006) .......... 13, 21

Bannum, Inc. v. United States,
60 Fed. Cl. 718 (2004) .......... 12

Bean Stuyvesant, LLC v. United States,
48 Fed. Cl. 303 (2000) .......... 12

Bowman Transp., Inc. V. Arkansas-Best Freight Sys.
419 U.S. 281 (1974) .......... 11

CACI, Inc. v. United States,
719 F.2d 1567 (Fed. Cir. 1983) .......... 12

CCL Serv. Corp. v. United States,
48 Fed. Cl. 113 (2000) .......... 12

Camp v. Pitts,
411 U.S. 138 (1973) .......... 10

Ceres Environmental Services,
52 Fed. Cl. at 38 .......... 27

Chapman Law Firm Co. v. United States,
62 Fed. Cl. 464 (2004) .......... 11

Chapman Law Firm Co. v. United States,
65 Fed. Cl. 422 (2005) .......... 13, 15

Cigna Gov't Servs., LLC v. United States,
70 Fed. Cl. 100 (2006) .......... 11, 13

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971) ........ 11

FMC Corp. v. United States,
3 F.3d 424 (Fed. Cir. 1993) ........ 12

Gentex Corp. v. United States,
58 Fed. Cl. 634 (2003) ........ 11

Keeton Corrections, Inc. v. United States,
59 Fed. Cl. 753 (2004) ........ 11, 13

Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983) ........ 11

PGBA, LLC v. United States,
57 Fed. Cl. 655 (2003) ........ 10, 12

PGBA, LLC v. United States,
389 F.3d 1219 (Fed. Cir. 2004) ........ 12, 14, 15

RAMCOR Servs. Group, Inc. v. United States,
185 F.3d 1286 (Fed. Cir. 1999) ........ 10

San Diego Beverage & Kup v. United States,
997 F. Supp. 1343 (S.D. Cal. 1998) ........ 26

Sierra Military Health Services, Inc. v. United States,
58 Fed. Cl. 573 (2003) ........ 26

Spherix, Inc. v. United States,
62 Fed. Cl. 497 (2004) ........ 13, 15, 18

## STATUTES

5 U.S.C. § 706(s) ........ 10

28 U.S.C. § 1491(b)(4) ........ 10

31 U.S.C. § 3553 ........ 15

31 U.S.C. § 3553(c) ........ 2, 15, 16

31 U.S.C. § 3553(c)(1) .......... 9, 15

31 U.S.C. § 3553(d)(3)(C)(i)(I) .......... 26

31 U.S.C. § 3554(b) .......... 27

31 U.S.C. § 3554(b)(2) .......... 26

48 C.F.R. § 1.701 .......... 18

48 C.F.R. § 33.104(b) .......... 16

48 C.F.R. § 33.104(b)(1) .......... 16, 17, 18

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| GENERAL INJECTABLES & VACCINES, INC., Plaintiff, v. THE UNITED STATES, Defendant, and MCKESSON SPECIALTY DISTRIBUTION, LLC, Defendant-Intervenor. | ) | No. 06-683C (Judge Eric G. Bruggink) |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND DECLARATORY RELIEF**

Pursuant to Rule 7 of the Rules of the United States Court of Federal Claims ("RCFC"), and the scheduling order dated October 3, 2006, defendant, the United States, respectfully opposes plaintiff's motion for a temporary restraining order, preliminary injunction and declaratory relief. In opposing plaintiff's motion, we rely upon the complaint, the administrative record, and the following brief.

**STATEMENT OF THE ISSUES**

1. Whether the written Findings & Determination ("F&D") of the Centers for Disease Control and Prevention ("CDC"), dated September 7, 2006, which concluded that it is in the best interests of the United States, due to urgent and compelling circumstances, to award the contract to defendant-intervenor McKesson Specialty Distribution, LLC, ("McKesson"), pending a decision by the Government Accountability Office ("GAO") regarding General Injectables &

Vaccines' ("GIV" or "plaintiff") protest of the award, is arbitrary, capricious, an abuse of discretion, or otherwise unlawful.

2. Whether the Court should preliminarily enjoin the CDC from continuing performance of the contract with McKesson pending the GAO's decision when plaintiff will not suffer irreparable harm and the balance of harms clearly favors the Government.

## STATEMENT OF THE CASE

This case is a challenge to a CDC decision, issued pursuant to the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553(c), to override an automatic stay issued during a bid protest that is pending before the GAO. The GAO protest is based upon GIV's pre-award challenge upon its exclusion from the competitive range for the CDC's vaccine distribution program. While the GAO protest was pending, the CDC determined that due to urgent and compelling circumstances it was in the best interests of the United States to award the vaccine distribution contract to McKesson pending the GAO's decision. GIV filed suit in this Court, alleging that the CDC's decision to override the stay was arbitrary and capricious and demanding injunctive relief.

## STATEMENT OF FACTS

The Centers for Disease Control and Prevention (CDC) is a component of the Department of Health and Human Services (DHHS) and is a part of the Public Health Service. The CDC's mission is to promote health and quality of life by preventing and controlling disease, injury, and disability.

## I. <u>The CDC's Vaccine Distribution Program</u>

The Vaccines For Children ("VFC") program was created by the Omnibus Budget Reconciliation Act ("OBRA") of 1993 as Section 1928 of the Social Security Act, and was enacted on August 10, 1993. AR 6.[1]

On October 1, 1994, the U.S. Department of Health and Human Services, through the CDC, implemented the VFC program and currently provides federally purchased vaccines to all qualified children from birth through 18 years. AR 6. Children qualify for vaccines under the program if they are enrolled in Medicaid, have no health insurance, have health insurance that does not provide for immunizations and are seen at an approved immunization center, or are American Indian or Alaksa Native. AR 6.

Vaccines currently approved for inclusion in the VFC program for children, and purchased though the Federal contract, include: Diphteria/Tetanus/Pertussis, Hepatitis B, Hepatitis A, Influenza, Measles/Mumps/Rubella, Meningococcal, Pneumococcal, Poliomyleitis and Varicella. AR 6.

The CDC also has Federal contracts for the purchase of adult vaccines. The vaccines currently purchased through the Federal adult contract include Hepatitis B, Hepatitis A, Influenza, Pneumococcal and Tetanus. AR 6.

Through the VFC program, the CDC also meets a legislative requirement to maintain stockpiles of Federal contract pediatric vaccines that would represent six months of national demand. AR 6.

---

[1] "AR__" refers to the administrative record filed in this case on October 6, 2006, and on October 17, 2006.

The CDC maintains multiple contracts to purchase large volumes of vaccines at discounted prices for public use with each of the vaccine manufacturers licensed to sell vaccines in the United States and its Territories. The CDC and authorized users of the CDC's vaccine supply contracts (individual states, health departments for selected metropolitan areas, and U.S. Territories) purchase vaccines off of these contracts for use in specific federally mandated programs such as the VFC, maintenance of stockpiles for public health emergencies, and other uses specified in the contracts and necessary for the protection of the public from preventable diseases.

The management and distribution of vaccines purchased through CDC's supply contracts is handled individually by each of 64 immunization projects (states, selected major cities, or U.S. Territories) that are currently authorized to purchase vaccines from CDC supply contracts. AR 6.

The 64 projects have developed their own unique storage facilities, processes, and sometimes systems, to support distribution of vaccines from the manufacturer to providers. AR 6. Some Projects are outsourcing the ordering and/or distribution of vaccines, some are using in-house resources for these functions, and some are joining in combination with one or more or the other projects to pool resources to cover these functions. AR 6.

CDC pays indirectly for its portion of each individual project's vaccine management and distribution system through reimbursements to States and local health departments with VFC entitlement funds and direct grants.

Vaccines that are purchased by CDC for stockpiling are stored at manufacturers' facilities under separate contracts that CDC maintains and pays for directly to manufacturers for

storage and rotation of vaccine.

## II. Solicitation No. 2006-N-08248

In 2003, CDC began the process of critically reviewing vaccine management at the Federal, state, and local levels in order to assess current practices and develop methods and strategies to enhance this important activity. Declaration of Dr. Jeanne Santoli, Dated October 17, 2006,[2] ("Santoli Decl.") ¶ 10.

This project, known as the Vaccine Management Business Improvement Project ("VMBIP"), was used to identify opportunities and develop solutions toward improving efficiency, accountability, and the nation's ability to respond to public health crises. Santoli Decl. ¶ 11.

On November 1, 2005, the CDC issued Solicitation No. 2006-N-08248 as full and open competition. AR 1-84. The purpose of Solicitation No. 2006-N-08248 is to provide centralized receipt, storage and distribution of licensed vaccines purchased under separate Federal supply contracts and non-federal contracts. AR 8. The goal of the solicitation is to enhance operating efficiency, improve vaccine inventory visibility and reduce operating expenses in the management and distribution of vaccines purchased with Federal funds for public use. AR 7.

Prior to the issuance of Solicitation No. 2006-N-08248, the CDC did not have a contract in place for the centralized distribution of vaccines. Santoli Decl. ¶ 13.

The Solicitation divided the distribution locations into geographical regions, East and West, and Texas as a partial small business set aside region. AR 9.

Pursuant to Solicitation No. 2006-N-08248, the implementation of centralized

[2] Dr. Santoli's declaration is attached to this brief.

distribution is to occur in three phases: pilot sites, projects with existing third party distribution, and projects with existing in-house distribution. AR 7.

Offerors were invited to propose on one or more regions and the CDC reserved the right to award to as few as one and as many as three contractors. AR 127-176.

The award of a fixed price contract (with economic price adjustment) was determined to be in the Government's best interest. Through Amendment 5, the solicitation informed all offerors that the degree of importance of cost/price as a factor could become greater depending upon the degree of equality of the technical proposal and other factors evaluated. AR 127-176.

When competing technical proposals and other factors evaluated are determined to be substantially equal, cost/price would become the controlling factor. AR 127-176.

## III. <u>Proposals Pursuant To Solicitation No. 2006-N-08248</u>

GIV's initial proposal provided an offer for the East region alone. No offers were received from small business concerns for Texas. After pre-screening and evaluation of technical and business proposals, all offerors were determined to be Technically Acceptable and were included in the initial competitive range. Oral presentations were conducted during the week of April 17 for all offerors.

Amendment 0006, issued on Feb. 27, 2006, dissolved the small business partial set aside. AR 177-181. Offerors were allowed to revise their proposals based upon the dissolution of the set aside and its incorporation into the West Region of the Solicitation. Proposed revisions to technical proposals were due May 16, 2006.

Amendment 0007, issued on May 2, 2006, clarified the Government's source selection methodology. AR 182-191. The amendment clarified the sequential order of evaluation. The

order of evaluation was stated to be: (1) Go/No Go Requirement, (2) review of technical and business proposals, (3) oral presentation, (4) final proposal revisions, (5) past performance, and (6) site visits. AR 182-191. Selection would be made based on the best overall value to the Government and the degree of importance cost/price as a factor could become greater depending upon the degree of equality of the technical proposal and other factors evaluated.

Offerors were notified that when competing technical proposals and other factors evaluated are determined to be substantially equal, cost/price would become the controlling factor. AR 182-191( M.8 Source Selection). This amendment also provided updates to the implementation timeline information, AR 182-191(Sections C, J and L), and added incremental funding provisions to Section B.

Discussions were held with all offerors on May 8, 2006, and offerors were notified that final proposal revisions were due May 23, 2006. On May 11, GIV, via email, raised some significant issues regarding the contract requirements and it be came apparent that GIV understood the requirement to mean that GIV would need a minimum of 3 distribution facilities because the solicitation stated that the Government estimate of vaccine was 21 million doses and no more than 50 percent and 10 million doses could be stored in any one location. In fact, the Government estimate was determined to be 20,000,000 doses. As a result, and in direct response to the concerns raised by GIV, the Government issued Amendment 0008 which allowed GIV to propose on the West region as well as the East. AR 192-193.

Amendment 0008, issued on May 12, 2006, in response to discussions, clarified Section C- Description/Specification/Work Statements, C.4 Distribution Requirement**,** B. Storage,

Handling, and Control of Inventory; and stated that if the contract is awarded to one contractor that a minimum of two distribution centers are required and if more than one contract is awarded that each contractor would have to have a minimum of one distribution center. AR 192-193. The amendment also incorporated change to the CDC Operating Inventory and Stockpile Storage Space Guidance; deleted Attachment J.3 and updated Attachment J.18; and communicated the new due date of June 6, 2006, for final proposal revisions.

Final proposal revisions were received from all offerors in the competitive range and were evaluated. A report was issued by the Technical Evaluation Panel upon the results of those evaluations. A second round of oral presentations was conducted on June 22 and a summary report of the presentations was issued on June 26, 2006.

During negotiations, after introductions and prior to reviewing the procedures for submitting the Final Proposal Revisions, GIV was informed that its proposed costs were considered exorbitant.

On July 27, 2006, a second competitive range determination was made that excluded GIV from further considerations based on its proposed cost.

GIV was informed that it had been excluded from the competitive range. GIV requested a debriefing and the CDC responded by issuing a written debriefing on July 27. AR 305-309.

## IV. GIV's Bid Protests At The GAO And The CDC's Override Of The CICA Stay Of Award

On August 7, 2006, GIV filed a pre-award protest, B-298590, with the GAO. AR 244.

GIV's filing of this protest triggered an automatic stay of a contract award pursuant to Solicitation No. 2006-N-08248. 31 U.S.C. § 3553(c)(1).

On August 25, 2006, GIV filed a supplemental protest, B-298590.2, with the GAO. AR 244-50.

On September 7, 2006, the CDC, after careful consideration, determined that it was in the best interest of the United States, due to urgent and compelling circumstances, to award the contract pursuant to Solicitation No. 2006-N-08248 to McKesson notwithstanding GIV's pending protests at the GAO. AR 225-229.

On September 12, 2006, the CDC notified the GAO that it was awarding the contract to McKesson on that same date. AR 236.

On September 13, 2006, the CDC provided a copy of the F&D to the GAO and counsel for GIV. AR 237-41.

On September 29, 2006, GIV filed a third protest with the GAO, B-298590.3. AR 357-367. GIV's three protests are currently pending before the GAO. The GAO hopes to issue decisions upon the merits of those protests by January 18, 2007. AR 368.

## SUMMARY OF THE ARGUMENT

The Court reviews the CDC's written "urgent and compelling" finding pursuant to the "arbitrary and capricious" standard of the Administrative Procedure Act ("APA"). Because CDC's written F&D, that, due to urgent and compelling circumstances, it was in the best interest of the United States to award the contract pending the GAO protests articulates a rational basis, the Court should not disturb it. This case presents the unusual situation where there is no incumbent Federal contractor to provide essential services during the GAO protest period.

This Court should not grant injunctive relief without a consideration of all four injunctive factors. Even if GIV could demonstrate a likelihood of success upon the merits, the balance of harms clearly weighs in favor of the Government, as the automatic stay imposes an unacceptable risk that the Government would not be able to provide an essential immunization service to the public. Furthermore, GIV has failed to demonstrate that it will suffer irreparable harm as a result of McKesson's performance of the contract. Finally, the public interest strongly weighs in favor of the uninterrupted supply of vaccines. Accordingly, GIV's request for a preliminary injunction should be denied.

## ARGUMENT

### I. Standard Of Review

#### A. The Substantive "Arbitrary And Capricious" Standard

In a procurement-related challenge, the Court assesses the agency's decision pursuant to the familiar review standard of the APA, 5 U.S.C. § 706(s), as incorporated by the Tucker Act, 28 U.S.C. § 1491(b)(4). RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286,

1291 (Fed. Cir. 1999). Thus, GIV must "prov[e] that the override decision here was arbitrary and capricious." PGBA, LLC v. United States, 57 Fed. Cl. 655, 660 (2003).

Application of the arbitrary and capricious standard involves neither judicial fact finding, nor review of the agency's factual statements for "substantial evidence." See Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (citing Camp v. Pitts, 411 U.S. 138, 140 (1973)). Rather, the Court will sustain an agency's decision "evincing rational reasoning and consideration of relevant factors." Id. at 1058 (citing Bowman Transp., Inc. v Arkansas-Best Freight Sys., 419 U.S. 281, 285 (1974)). In order to prevail, the protestor must show by a preponderance of the evidence that the agency's actions were either without a reasonable basis or in violation of applicable procurement law. Cigna Gov't Servs., LLC v. United States, 70 Fed. Cl. 100, 109-10 (2006) (citing Gentex Corp. v. United States, 58 Fed. Cl. 634, 648 (2003)) (additional citations omitted). An agency's decision may be found to be arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Keeton Corrections, Inc. v. United States, 59 Fed. Cl. 753, 755 (2004) (citing Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

In evaluating the CDC's F&D, the court "is not empowered to substitute its judgment for that of the agency." Id. (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). Consequently, in the context of this action, the Court should simply assess whether the CDC's written F&D supplies "a rational basis" for the agency's determination to

award the contract to McKesson. See Chapman Law Firm Co. v. United States, 62 Fed. Cl. 464, 466 (2004) ("Chapman I").

**B. The Standard For Preliminary Injunctive Relief**

Injunctive relief for a disappointed bidder is an "extraordinary remedy" appropriate "only in extremely limited circumstances." CCL Serv. Corp. v. United States, 48 Fed. Cl. 113, 120 (2000) (quoting CACI, Inc. v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983)); FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). In order to obtain a preliminary injunction, a plaintiff must carry the burden of establishing entitlement to this extraordinary relief by clear and convincing evidence based upon the following factors: (1) a likelihood of success upon the merits; (2) that the plaintiff will suffer irreparable injury if injunctive relief is not granted; (3) that, if the injunction is not granted, the harm to the plaintiff will outweigh the harm to the Government and third parties; and (4) that granting the injunction serves the public interest. PGBA, 57 Fed. Cl. at 657; Bean Stuyvesant, LLC v. United States, 48 Fed. Cl. 303, 320-21 (2000). But see Bannum, Inc. v. United States, 60 Fed. Cl. 718, 723-24 (2004) (applying a preponderance of the evidence standard). The decision whether to grant an injunction is within the sound discretion of the trial court. FMC Corp., 3 F.3d at 427. Even if a protestor prevails upon the merits by demonstrating that the agency's decision is arbitrary and capricious, the Court need not grant any relief to the plaintiff based upon the remaining three factors for injunctive relief. PGBA, LLC v. United States, 389 F.3d 1219, 1227-32 (Fed. Cir. 2004) (affirming the Court of Federal Claims'

decision not to grant any relief to plaintiff, including declaratory relief despite a showing that the agency's decision was arbitrary and capricious).

## II. This Court Should Not Award Injunctive Relief Without Consideration Of The Injunctive Factors

In its memorandum in support of its motion for a temporary restraining order, preliminary injunction, and declaratory relief, GIV suggests that this Court may grant it declaratory relief without considering and evaluating the injunctive factors. Pl. Mem. at 10-11.[3] It is true that several recent decisions of this Court have held that it is not necessary to evaluate the injunctive factors after a finding that any agency override determination lacks validity, in order to reinstate the statutory stay of contract performance applicable during a GAO bid protest. See Automation Techs., Inc. v. United States, 2006 WL 2720642, *9 (Fed. Cl. Sept. 11, 2006); Advanced Sys. Dev. v. United States, 72 Fed. Cl. 25, 36-37 (2006); Cigna, 70 Fed. Cl. at 115; Chapman Law Firm Co. v. United States, 65 Fed. Cl. 422, 424 (2005) ("Chapman II"). Cf. Spherix, Inc. v. United States, 62 Fed. Cl. 497, 503 (2004) (finding that declaratory relief with remand has not been shown to be the proper relief in CICA override cases); Keeton Corrections, 59 Fed. Cl. at 754, 759 (granting plaintiff's request for declaratory relief after the Court had previously denied plaintiff's motions for a temporary restraining order and preliminary injunction). In this case, the parties are currently addressing plaintiff's request for a preliminary injunction and none of these cases suggest that the Court can grant a temporary restraining order or preliminary injunction

[3] "Pl. Mem.__" refers to plaintiff's Memorandum Of Points And Authorities In Support Of Plaintiff's Motion For a Temporary Restraining Order And Preliminary Injunction, filed with the Court on October 2, 2006.

without a demonstration by the plaintiff that these extraordinary and drastic remedies should be granted based upon an analysis of the four factors.

In addition, while declaratory relief typically does not require an analysis of the four injunctive factors, when declaratory relief would have the same effect as an injunction, the Court should evaluate plaintiff's request for relief as if plaintiff had requested injunctive relief alone. PGBA, LLC v. United States, 389 F.3d 1219, 1227-28 (Fed. Cir. 2004). In PGBA, this Court denied declaratory and injunctive relief to the plaintiff in a bid protest, despite a finding by this Court that the Government's actions were arbitrary and capricious. Id. at 1223. The plaintiff in PGBA requested declaratory relief. However, this Court found that declaratory relief would be tantamount to an injunction and, therefore, this Court applied the four injunctive factors in determining the appropriateness of declaratory relief or an injunction. Id. at 1222-23. After evaluating these factors, this Court denied declaratory and injunctive relief. Id. at 1223.

In affirming this Court's decision, the Federal Circuit concluded that when declaratory relief would be tantamount to injunctive relief, the plaintiff's request for relief should be treated as if plaintiff had requested injunctive relief alone. Id. at 1228. Therefore, analysis of the four factors for injunctive relief was appropriate. Id. Accordingly, if this Court were to find that GIV's request for declaratory relief would have the same affect as an injunction, it should not grant GIV's request for declaratory relief without evaluating the four injunctive factors.

Furthermore, GIV has requested a temporary restraining order, and a preliminary and permanent injunction prohibiting the CDC from permitting performance of the contract with

McKesson until the completion of the protests pending before the GAO. Compl. at 1,10.[4] This Court has previously noted that such a request requires the Court to consider the relevant equitable factors:

> It is recognized that there are circumstances where a party might seek to enjoin an agency from exercising its statutory override authority throughout the entire GAO protest period rather than simply contesting the validity of a specific override determination. See Spherix, Inc. v. United States, 62 Fed. Cl. 497 (2004). To enter such an injunction, this court must, of course, consider the relevant equitable factors. Id. PGBA sets forth the proposition that if injunctive relief is truly sought, the court does not "err in looking to the traditional equitable factors in determining whether to set aside award of the contract . . . ." 389 F.3d at 1228.

Chapman II, 65 Fed. Cl. at 424. GIV's complaint demonstrates that injunctive relief is truly sought. Therefore, this Court should not award a preliminary injunction without considering whether GIV meets its legal burden in establishing that it is entitled to injunctive relief.

## III. GIV's Request For Preliminary Injunctive Relief Should Be Denied

CICA, 31 U.S.C. § 3553, grants an agency significant discretion in choosing to override an automatic pre-award stay. Pursuant to 31 U.S.C. § 3553(c):

> (1) Except as provided in paragraph (2) of this subsection, a contract may not be awarded in any procurement after the Federal agency has received notice of a protest with respect to such procurement from the Comptroller General and while the protest is pending.
>
> (2) The head of the procuring activity responsible for award of a contract may authorize the award of the contract (notwithstanding a protest of which the Federal agency has notice under this section) –

[4] "Compl.__" refers to the complaint in this matter, filed with the court on October 2, 2006.

> > (A) upon a written finding that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General under this subchapter; and
> >
> > (B) after the Comptroller General is advised of that finding.
>
> (3) A finding may not be made under paragraph (2)(A) of this subsection unless the award of the contract is otherwise likely to occur within 30 days after the making of such finding.

31 U.S.C. § 3553(c); see also 48 C.F.R. § 33.104(b)(1). In this case, the CDC overrode the stay pursuant to the "urgent and compelling circumstances" provision of the statute. AR225-29.

**A. The CDC Applied The Correct Legal Standard In Overriding The Pre-Award Stay**

GIV contends that the CDC relied upon the legal standard applicable to an override in post-award stays to override the pre-award stay that was in effect in this case. Pl. Memo. at 11-13. GIV is mistaken. In its request for authorization to award the contract in face of the protest, AR 225, the CDC specifically states that it is seeking authorization to override the pre-award stay in "accordance with FAR Subpart 33.104(b)(1) and HHSAR Supbart 333.104(b)(1)," which govern the override of pre-award stays. Specifically, 48 CFC 33.104(b) states the following:

> (b) Protests before award.
>
> > (1) When the agency has received notice from the GAO of a protest filed directly with the GAO, a contract may not be awarded unless authorized, in accordance with agency procedures, by the head of the contracting activity, on a nondelegable basis, upon a written finding that--
> >
> > > (i) Urgent and compelling circumstances which significantly affect the interest of the United States will not permit awaiting the decision of the GAO; and

> (ii) Award is likely to occur within 30 days of the written finding.
>
> (2) A contract award shall not be authorized until the agency has notified the GAO of the finding in subparagraph (b)(1) of this section.
>
> (3) When a protest against the making of an award is received and award will be withheld pending disposition of the protest, the contracting officer should inform the offerors whose offers might become eligible for award of the protest. If appropriate, those offerors should be requested, before expiration of the time for acceptance of their offer, to extend the time for acceptance to avoid the need for resolicitation. In the event of failure to obtain such extensions of offers, consideration should be given to proceeding under subparagraph (b)(1) of this section.

In this case, the CDC states in its request for authorization, in accordance with FAR Subpart 33.104(b)(1), that the "attached Findings and Determination document specifies that it is in the best interest of the Government due to urgent and compelling circumstances to award this contract to McKesson, prior to disposition of the protest and supplemental by GAO." AR 225. In its F&D, the CDC clearly cites the standard it is applying, AR 227, and explains that "[u]rgent and compelling circumstances exist which will not permit awaiting the decision of the GAO." AR 227-28. Contrary to GIV's claim, Pl. Memo. 12, there is no lack of clarity concerning the legal standard relied upon by the GIV in reaching its conclusion to override the pre-award stay: the CDC applied the correct legal standard.

**B. The CDC's Written F&D Is Rational And In Accordance With Applicable Law**

GIV does not, and cannot, succeed upon the merits. CDC's written F& D rationally explains why urgent and compelling circumstances exist which did not permit awaiting the decision of the GAO.

In setting forth "enough facts and circumstances to clearly and convincingly justify the specific determination made," a F&D must include: (a) identification of the agency and of the contracting activity and specific identifications of the document as a F&D; (b) nature and/or description of the action being approved; (c) citation of the appropriate statute and/or regulation upon which the F&D is based; (d) findings that detail the particular circumstances, facts, or reasoning essential to support the determination; (e) a determination, based upon the findings, that the proposed action is justified under the applicable statute or regulation; (f) expiration of the F&D, if required; (g) the signature of the official authorized to sign the F&D. Spherix, 62 Fed. Cl. at 504 (quoting 48 C.F.R. § 1.701). The CDC's F&D meets all of these requirements, and GIV has not alleged, much less demonstrated, that the F&D, fails to meet any of the above requirements.

The F&D clearly identifies the agency, the contracting activity, and the document as a Finding & Determination. AR 226. It clearly states the nature of the action being approved (authorizing the award of a contract pursuant to Solicitation No. 2006-N-08248). AR 226, 228. It cites the appropriate regulation upon which the F&D is based – FAR § 33.104(b)(1). AR 226. It gives detailed findings describing urgent and compelling circumstances that did not permit awaiting the decision of the GAO. AR 227. It contains a determination that the proposed action is authorized under the applicable regulation. AR 228. Finally, it is signed by the required agency personnel. AR 228-29. Therefore, the F&D follows all the proper procedural requirements and, as we explain below, it has a rational basis.

**1. GIV Is Not An "Incumbent" And Has Never Had A Contractual Relationship With The CDC For The Nationalized Vaccine Distribution Function**

GIV contends that the CDC override of the CICA stay is arbitrary because the CDC did not explain why it cannot obtain the services from sources other than by overriding the stay and suggests that in this case "the incumbent contracts apparently could be extended." Pl. Memo. 13-17, 18. Regardless of GIV's repeated attempts to portray itself as an "incumbent" in its complaint and memorandum, GIV does not have, and has never had, a contractual relationship with the CDC for the nationalized vaccine distribution function. Prior to the September 2006 contract award to McKesson, the CDC did not have a contract in place for consolidated vaccine distribution. Santoli Decl. ¶ 13.

GIV's current role in the distribution of CDC vaccines is to provide some of the state projects with outsourcing to manage and distribute vaccines purchased off the CDC supply contracts. GIV has no current or past contractual relationship with the CDC to provide this function. Our best information is that GIV provides distribution services to approximately 23 projects that will transition eventually to a consolidated national vaccine distribution system. While GIV implies that it is a predecessor contractor, this implication is incorrect and misleading.

**2. The CDC's Notification Of Contract Award To The GAO Is In Compliance With The Statutory Requirement**

GIV contends that "lack of clarity also exists as to whether CDC in fact authorized awarding the contract to McKesson before notifying GAO of CDC's decision to override the pre-award stay, which in and of itself would constitutute a violation of CICA." Pl. Memo. 12. The documents show that there is no lack of clarity upon this point.

In this case, the documents reflect that CDC notified the GAO and awarded the contract on the same day, September 12, 2006. AR 236. There is no statutory prohibition against notifying the GAO and awarding the contract on the same day. The CDC's written F&D was executed on September 7, 2006. AR 225-29. Accordingly, the CDC complied with established procedures by generating the F&D prior to awarding the contract while the GAO protest is pending.

**3. The Written Findings Explain Why Cost Savings Support An Override Of The Stay**

GIV also contends that "cost savings are a legally insufficient rationale to support the override of a CICA stay." Pl. Memo. 20. In support for its argument, GIV relies solely upon the CDC's statement in the F&D that the "federal centralized vaccine distribution contract award will save CDC approximately $6 million on an annual basis." Id. GIV completely dismisses ¶ 3 of the F&D which establishes that GIV's cost proposal of $241,640,603.77 was so excessive that it exceeded McKesson's offer by $142,670,056.75. Therefore, the cost savings to the CDC was not just the $6 million noted in ¶ 7(D); the cost savings was in excess of $148 million. GIV does not deny that its cost proposal was $241,640,603.77. Instead, it argues that it is "prejudicial and extremely irrelevant," Pl. Memo. FN 11, for this Court to know such information and provides the Court an affidavit from a purported "valuation expert" who states in a conclusory fashion that he has read the F&D and that it is his "opinion that the F&D materially overstates what the cost of the contract would be under GIV's bid."[5] Kenyon Declaration ¶ 5.

[5] The undersigned has learned that GIV has taken the position at the GAO that the cost of the contract under GIV's bid would be almost $100 million, not the $241 million noted in the F&D. Even if Mr. Kenyon's declaration is given the benefit of the doubt, and the F&D materially overstates what the cost of the contract would be under GIV's bid, by GIV's

This Court should dismiss Mr. Kenyon's declaration as an unreliable, speculative and uncorroborated inadmissible statement. GIV has provided absolutely no evidence to this Court in support of its argument that GIV's cost proposal, as noted by the CDC in the F&D, are inaccurate or inconsistent with the proposal submitted by GIV. In fact, GIV's goal, as articulated by its counsel during the October 3 telephone conference with this Court, is for the agency to re-solicit the procurement so that GIV, now armed with its competitors' cost and pricing information, could perhaps submit a proposal that is not $142,670,056.75 more than its closest competitor. To the best of our knowledge, that "relief" is not available to GIV in this Court or the GAO.

Furthermore, contrary to GIV's implication that the override was based purely upon "cost savings" is misleading. Pl. Memo. 20. GIV cites Advanced Systems for the proposition that "the mere fact that a new contract is better than its predecessor in terms of cost or performance is not enough to justify overriding a stay imposed by CICA. Thus, CDC's use of hoped-for financial savings and efficiencies as a basis for finding "urgent and compelling" circumstances fails as a matter of law." Pl. Memo. 20.

First, in this case there is no "predecessor" or incumbent. Second, this Court recently held that this Court did "not conclude that cost savings and other improvements can never be a sufficient basis to support an override." Automation Technoligies, 2006 WL 2720642at *7. GIV's contention is not supported by the facts or the case law it cites. However, as we explain

admission at the GAO, its bid would still be approximately $100 million more than its closest competitor.

below, cost was not the only (or most important factor) considered by CDC in its decision to override the stay.

### 4. The Written F&D Rationally Explains The Importance Of Implementing Awarding The Contract No Later Than September 8, 2006

GIV claims that CDC's assertions in the F&D that a continued delay in the award of the contract would have a negative public health impact has no merit because GIV currently distributes vaccines pursuant to several state contracts and it is willing to distribute vaccines upon the expiration of various state contracts while the GAO protest is pending. Pl. Memo. 13-18. GIV's "analysis" misses the point.

Each year, more than 60 million doses of public-purchased vaccine are purchased on CDC's federal vaccine purchase contracts and distributed to immunization providers across the United States to reach and protect vulnerable children, adolescents and adults. Santoli Decl. ¶ 6. At the present time, there are 64 Federal immunization grantees. These grantees either contract with a third party distributor or utilize state and/or local public health staff to store and distribute public purchased vaccines. Santoli Decl. ¶ 7. Twenty-six (26) grantees, distributing approximately 62 percent of the public doses in the United States (over 40 million doses per year), have contracts with a vaccine distributor. Many of these contracts expire prior to March 31, 2007. Four (4) of these contracts expire on or before December 31, 2006. Santoli Decl. ¶ 8. This includes the state of New Jersey, whose distribution contract will expire November 30, 2006. This may result in no vaccine distribution services in New Jersey as early as December 1, 2006. Santoli Decl. ¶ 8. It is not clear at this time if the other grantees with contracts expiring prior to December 31, 2006 will have the ability to extend existing contracts or at what costs

these extensions may be provided. Santoli Decl. ¶8. One contract with a vaccine distributor currently serves 14 grantees, representing over 20 percent of the nation's public purchased vaccine distribution. Santoli Decl. ¶ 9. It expires March 31, 2007, with no option periods for extensions. Santoli Decl. ¶ 9. This contract is not currently in the process of being renegotiated, under the assumption that these services will be replaced by the Federal contract. Santoli Decl. ¶9.

Thousands of staff hours, both upon the part of CDC and its state and local partners, have been dedicated to the task of transitioning vaccine distribution functions from existing state and local infrastructure to a centralized distributor. Santoli Decl. ¶ 16. Grantees have been working actively for a number of months to position their programs to "go live" with the centralized vaccine distributor. Roll on dates have been negotiated with each grantee to build a schedule designed to address a variety of program and timing issues. Santoli Decl. ¶ 16, 17. These issues include managing existing contract expirations, grantee staffing transitions, and vaccine draw down in preparation for transition to the centralized vaccine distributor. Santoli Decl. ¶ 18. In addition, grantees have engaged in communications with providers and other partners, preparing them for the process changes they must make to transition to the centralized distributor. Santoli Decl. ¶ 19. CDC has worked to keep this process of change on schedule to avoid disruptions in vaccine distribution to providers and clinics. Santoli Decl. ¶ 19.

Any additional delay to the start-up process for the new contract will require CDC to forego the current plan of incrementally bringing immunization programs onboard. Santoli Decl. . This will add an element of risk to the process and ultimately may threaten the successful transition of programs to the new distributor. Santoli Decl. ¶ 20. A disruption of the contract for

centralized distribution will have a negative public health impact in several important areas. First, the CDC will not be able to fulfill our public health role of assuring vaccination of the most vulnerable children, adolescents, and adults. Second, the CDC's ability to respond to public health emergencies and crises, including pandemic influenza, will be significantly compromised. Third, the successful completion of this critical re-tooling of vaccine management will be jeopardized. Santoli Decl. ¶s 21-24.

As part of planning for VMBIP, a detailed timeline was developed to allow for 64 immunization grantees to transition over to centralized vaccine distribution. This timeline allows for the necessary assessment and planning that each state needs to accomplish, based upon state-specific characteristics such as current distribution type, to achieve a seamless transition. Santoli Decl. ¶ 25.

The CDC has developed, in consultation with state and local health departments, a schedule for immunization programs to "roll on" to centralized distribution. This schedule takes into account a number of factors including the complexity of change for each immunization program, expiration of existing distribution contracts, projected vaccine inventory, and the ability to test process changes with the new distributor and a selected group of pilot programs. Following completion of the pilot period, the schedule transfers two or three programs a week to the new distributor. CDC's original schedule assumed contract award on July 31, 2006. Actual award was made September 12, 2006 due to delays related to the ongoing contract protest. The distributor will begin shipping vaccine November 13, 2006. Santoli Decl. ¶ 26.

If CDC is unable to continue working with the newly selected distributor, there will be insufficient preparation time for states to make the planned transition before their current

distribution activities are scheduled to discontinue. Santoli Decl. ¶ 27. The CDC's data indicates that, for a number of states, there are limited options to extend current vaccine distribution contracts to accommodate additional delays in the implementation of VMBIP. Santoli Decl. ¶ 27. An additional delay would seriously impact CDC's ability to conduct pilot testing of the new process. Santoli Decl. ¶ 28. Depending upon the length of the delay, CDC could be placed in a position where which large numbers of immunization programs must be transferred to the new distributor all at once. Santoli Decl. ¶ 28. This is due to the fact that many of the programs' distribution contracts will expire by March 31, 2007. It is unclear if these contracts can be extended. Santoli Decl. ¶ 28. One contract, the New York Multistate Distribution Contract, does not have option periods for extension. Santoli Decl. ¶ 28. Regardless of that current vendor's willingness to enact new or extend current contracts, it is unclear if state and/or local contracting procedures will allow this to happen in the timeframes currently available. Santoli Decl. ¶ 28.

The CDC and its partners have worked to avoid delays. Santoli Decl. ¶ 29. Furthermore, additional delays would hamper CDC's ability to pilot test process changes with selected programs and make adjustments before applying these changes to other programs. Santoli Decl. ¶ 29. This adds more risk to the process and undermines more than two years of preparation work by CDC and its partners. Santoli Decl. ¶ 29. Introducing the new process without pilot testing will be unacceptable to many of CDC's partners. Santoli Decl. ¶ 29.

Many state and local health departments have been working with providers in their jurisdictions for more than one year in order to prepare for the transition. This work is based upon the relationships these programs have built with their providers. Programs have

communicated to CDC the difficulty created by shifting proposed start dates. The delays cause uncertainty which negatively impacts the relationship between the immunization program and the provider. Ultimately, the credibility of the project is damaged by shifting start dates. Santoli Decl. ¶ 30.

Any additional delays could mean that CDC would be unable to assure uninterrupted vaccine distribution to the providers serving the most vulnerable populations in those states. Santoli Decl. ¶ 32. Decreased vaccination coverage, particularly when it occurs among people living in the same geographic location, increases the likelihood of outbreaks of vaccine preventable diseases. Santoli Decl. ¶ 32.

Paragraph 7 of the F&D addresses the foregoing concerns in a rational, streamlined manner. While Dr. Santoli's declaration explains the concerns in a more detailed manner, the F&D clearly established that further "delay in the award of the contract will have a negative public health impact." AR 227.

### C. GIV Will Suffer No Specific, Irreparable Harm If The Stay Is Not Returned

GIV makes the conclusory allegation that it "will be irreparably harmed" if it is denied injunctive relief, because GIV will "lose the opportunity to compete for the CDC contract." Pl. Memo. 23-24. GIV also claims that it will be irreparably harmed in that McKesson will have gained a competitive edge through the performance of the contract. Pl. Memo. 24.

GIV fully participated in the procurement from the time the solicitation was issued in through submission of initial and revised offers and discussions. "In every procurement award there are generally more losers than winners. To find that a losing procurement participant suffers irreparable harm merely because it did not succeed with its contract proposal would

create in the losing party an automatic right to injunctive relief." San Diego Beverage & Kup v. United States, 997 F. Supp. 1343, 1347 (S.D. Cal. 1998). That should not be countenanced.

Even assuming, for the sake of argument, that: (1) GIV were somehow able to demonstrate a competitive disadvantage as a consequence of the override (which it has not and cannot); (2) it were to prevail before the GAO; and (3) the GAO were to reopen the procurement and require the agency to re-evaluate offers, the GAO and CDC would omit any advantages gained by McKesson during the bid protest period from any re-evaluation of the bids. 31 U.S.C. § 3554(b)(2) ("If the head of the procuring activity responsible for a contract makes a finding under section 3553(d)(3)(C)(i)(I) of this title, the Comptroller General shall make recommendations under this subsection without regard to any cost or disruption from terminating, recompeting, or reawarding the contract."). See Sierra Military Health Services, Inc. v. United States, 58 Fed. Cl. 573, 583 (2003) (favorably citing 31 U.S.C. § 3554(b) in finding no irreparable harm).

In short, GIV's position will not change whether the Court grants injunctive relief or not. For all of these reasons, GIV's inability to demonstrate irreparable harm defeats its request for injunctive relief.

### D. Any Harm Which Denial Of Injunctive Relief Would Cause To GIV Would Not Outweigh The Harm To The United States

Significantly, GIV waited until October 2, 2006, almost three weeks after the contract was awarded on September 12, 2004, to file this action in this Court. See Compl. GIV now alleges, without support, that it will suffer irreparable harm if the stay is not re-instated, whereas CDC will suffer "little to no harm," because CDC's "concern about delay affecting vaccine distribution is unsupported by the record." Pl. Memo. 24. GIV's bases its position upon its

claim that the GAO will resolve its pending protests by mid-November. GIV's statement ignores the fact that it has filed a third protest with the GAO. The GAO has the discretion to decide that protest as late as January 2007. AR 368.

Furthermore, GIV's blanket allegation that the CDC will suffer no harm ignores the burden placed upon a plaintiff seeking an injunction to prove each of the four elements required for such a remedy. Ceres Environmental Services, 52 Fed. Cl. at 38. The balance of harms is plainly in the Government's favor.

Granting injunctive relief will not, as GIV alleges, result in a minor, two-month delay while awaiting GAO's decision. GIV conveniently ignores the transition period, which is required to transition the programs to a Federal distribution system. See Section 4 above. Accordingly, the harm to the United States of an injunction are significant and very real. GIV has not met its burden to prove that the balance of harms is in its favor.

**E. Issuance Of An Injunction Would Not Be In The Public Interest**

GIV contends that the issuance of an injunction would be in the public interest because this case "parallels the PGBA case." Pl. Memo. 25. Specifically, GIV proposes that the Court issue an injunction because it has alleged in its GAO protest that "improper pressure was exerted on members of the technical evaluation panel to alter their evaluation of one of the GIV's competitors, which prejudiced consideration of GIV's bid." Pl. Memo. 25. GIV further states that "[s]uch action, if allowed to be demonstrated during the GAO bid protest resolution process, strikes at the heart of the public interest in honest and fair competition. Allowing an agency to override the CICA stay where such allegations exist and adequate support for CDC's contention that reinstating the stay to wait for GAO's November 16, 2006 decision will impair the

distribution of vaccine does not exist, is clearly contrary to the public interest." Pl. Memo. 25-26.

GIV misunderstands its burden of proof. There is no legal support for GIV's proposition that this Court should grant injunctive relief for the purpose of allowing a protestor to proceed on the merits before the GAO regardless of the nature of the protestor's claim. GIV's blanket claim that "here the public's interest in ensuring that the new contract represents the best overall value to the government is best served by granting GIV the injuntive relief it seeks" is also unavailing. The purpose of the this proceeding is not, as GIV claims, to "vindicate the public's interest in having its government conduct fair procurement procedures and to give honest and fair consideration to all bids." Pl. Memo. 26. That is the role of the GAO, who is presiding over the merits of plaintiff's protests. GIV has offered this Court no legitimate reason to grant injunctive relief in this case, and it certainly has not advanced any valid, reasonable argument to support its proposition that the issuance of an injunction would be in the public interest.

As noted above, any additional delays could mean that CDC would be unable to assure uninterrupted vaccine distribution to the providers serving vulnerable populations. Decreased vaccination coverage, particularly when it occurs among people living in the same geographic location, increases the likelihood of outbreaks of vaccine preventable diseases. As illustrated by the extensive mumps outbreak among college students in the Midwestern part of the United States during the winter and spring of this year, the United States is still very much at risk for vaccine preventable diseases unless high vaccination coverage is sustained. High vaccination coverage cannot be achieved or sustained without ready access to recommended vaccines each and every time a child accesses the health care system. Santoli Decl. ¶s 32-34.

Research has demonstrated that missed opportunities, when a child presents for health care and is due to receive a vaccine but is not vaccinated, are one of the most important causes of low immunization coverage. Previously, many missed opportunities occurred among vulnerable children when their parents were referred to the local health departments because they were unable to afford vaccination services in their provider's office. These missed opportunities resulted in low vaccination coverage among US preschool children that led to the measles outbreaks (including more than 55,000 cases and 123 deaths) during 1989-1991. Santoli Decl. ¶ 35-37.

In the aftermath of these outbreaks Congress created the VCP to bring public purchased vaccines into public and private health care settings, so that the country's most vulnerable children could be vaccinated and missed opportunities for vaccination would be reduced. When vaccination coverage is incomplete, particularly among children living in the same geographic area, the risk of outbreaks of vaccine-preventable diseases is increased. This puts a number of individuals at risk of infection, including the unvaccinated children themselves, the community in which they live, and individuals in the community who cannot be vaccinated due to medical problems (such as HIV infection) and depend upon a high level of vaccination in the community in order to protect them. Santoli Decl. ¶ 38-39.

A second important public health impact is the CDC's decreased ability to respond to public health emergencies and crises. One of the important benefits of centralized distribution for CDC is that it increases the visibility of approximately half of the nation's vaccine supply, enhancing the ability to manage natural disasters and vaccine supply shortages/disruptions. In addition, the visibility that centralized vaccine ordering and distribution provide have made

VMBIP an important platform upon which CDC's planning for pandemic influenza vaccine ordering and distribution rest. Santoli Decl. ¶s 40-41.

In the event of a natural disaster such as a hurricane, a centralized vaccine inventory allows CDC to get vaccine quickly to where it is needed most to serve persons impacted by the disaster as well as the emergency responders called in to help. Santoli Decl. ¶ 42.

Over the past six years, the United States has been beset by a large and unprecedented number of vaccine supply shortages. Between late 2000 and the spring of 2003, for example, the country experienced shortages of vaccines against 8 of 11 preventable disease in children. In addition, there have been shortages or delayed distribution of influenza vaccine for five of the past six years. Managing vaccine shortages requires substantial public health action at the Federal, state, and local levels to ensure that scarce vaccine resources are distributed as equitably as possible and that vaccines are targeted to high risk patients as appropriate. The CDC's experience in dealing with these shortages has shown it that visibility of vaccine distribution and the ability to direct vaccine distribution centrally are the two most critical tools for public health in the setting of a vaccine supply disruption. Because it provides both, VMBIP was designed to be an essential component of CDC's response to public health emergencies and crises. A delay in the CDC's ability to implement centralized distribution diminishes its ability to address disruptions in the United States vaccine supply. Santoli Decl. ¶ 42.

Over the past year, there has been substantial work carried out by Federal, state and local governments to develop influenza pandemic preparedness plans. Among CDC's responsibilities related to vaccination are the development of plans for allocation and distribution of pandemic vaccine to state and local public health jurisdictions. Because the vast majority (if not all)

pandemic influenza vaccine will be purchased by the Federal Government, VMBIP has been identified as the appropriate tool to support pandemic influenza vaccine ordering, distribution, and tracking. The Vaccine Ordering and Distribution System ("VODS") application, including specialized functionality related to pandemic influenza vaccine, is currently being developed for VMBIP and will be integrated into the information systems capabilities of the distributor awarded the contract for centralized distribution. Because of the unpredictability of influenza viruses, there is no way to know when CDC's pandemic preparedness activities will be needed to protect the United States population, but there is a great priority upon developing the methods and tools needed to manage such a catastrophic public health event as quickly as possible. A delay in CDC's ability to assure a workable system for the ordering and distribution of pandemic influenza vaccine leaves the United States unacceptably vulnerable. Santoli Decl. ¶ 44.

If this Court's decision were to re-impose the stay, the CDC would have to forgo the benefits of centralized distribution, including a smaller inventory with less risk of vaccine lost or wastage, visibility into the location of vaccine across the United States, and the ability to redirect vaccine as needed to manage shortages or natural disasters. Santoli Decl. ¶ 45.

The CDC's inability to implement centralized distribution translates into a major deficiency for pandemic preparedness because the re-tooled vaccine ordering and distribution system is the basis for the distribution of pandemic influenza vaccines. Santoli Decl. ¶ 46. This is an unacceptable vulnerability for the United States. Thus, the costs to the United States of an injunction are significant and very real. The public interest favors the override decision issued by the CDC.

## CONCLUSION

For these reasons, we respectfully request that the Court deny GIV's request for declaratory judgment and preliminary injunctive relief.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

/s/ Delisa M. Sánchez
DELISA M. SANCHEZ
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L St., N.W.
ATTN: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 616-0337
Facsimile: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

ELISE HARRIS
Assistant Regional Counsel
U.S. Department of Health and
Human Services
61 Forsyth Street, S.W.
Suite 5M60
Atlanta, GA 30303

Electronically filed,
October 17, 2006

CERTIFICATE OF FILING

I hereby certify that on this 17th day of October, 2006, a copy of the foregoing "DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND DECLARATORY RELIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Delisa M. Sánchez
DELISA M. SANCHEZ

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | |
|---|---|
| GENERAL INJECTABLES & VACCINES, INC., Plaintiff, v. UNITED STATES OF AMERICA, Defendant, and MCKESSON SPECIALTY DISTRIBUTION, LLC, Defendant-Intervenor. | No. 06-683C (Judge Eric G. Bruggink} |

## DECLARATION OF JEANNE SANTOLI

I make this statement in response to the protest of General Injectables & Vaccines, Inc., filed on October 2, 2006, against the Centers for Disease Control and Prevention ("CDC"). I base this statement upon information personally known to me.

1. I have been employed by the CDC since January 1998. I am currently the Deputy Director of the Immunizations Services Division in the National Center for Immunization and Respiratory Diseases at CDC and have held this position since March 2005. I assist in the management of this division, which administers the Vaccines for Children and Section 317 grant programs that support vaccine purchase and delivery among 64 state, urban area, and territorial grantees; provides federal vaccine purchase contracts for these programs and manages limited vaccine supply during times of vaccine shortages; conducts provider training and education; carries out operations research designed to improve immunization delivery; supports the development and use of immunization information systems; and carries out evaluation of the national immunization program by conducting assessments of vaccine coverage. Prior to this position at CDC, I previously served as the Associate Director for Science (4 years) and a medical epidemiologist (3 years) within the Immunization Services Division.

2. CDC operates two programs, the Vaccines for Children program (VFC) and the Section 317 discretionary grant program, which support vaccine delivery to vulnerable persons across the US.

3. Together, these programs support a vaccine delivery infrastructure at the state level and the provision of vaccines that are used in more than 44,000 public and private provider sites throughout the country, including private pediatricians, family physicians, and internists, as well as providers who serve in public health facilities, Federally Qualified Health Centers, and Rural Health Centers.

4. The provision of public-purchased vaccine creates a critical safety net to ensure the vaccination of vulnerable children, adolescents, and adults, offering protection against illness and mortality associated with a growing number of vaccine-preventable diseases for these individuals and the communities in which they live.

5. Populations served by these two programs include uninsured children and adults, Medicaid-eligible children, American Indian/Alaska Native children, and children whose health insurance does not cover vaccination.

6. Each year, more than 60 million doses of public-purchased vaccine are purchased on CDC's federal vaccine purchase contracts and distributed to immunization providers across the US to reach and protect our most vulnerable children, adolescents and adults.

7. At the present time, there are 64 federal immunization grantees. These grantees either contract with a third party distributor or utilize state and/or local public health staff to store and distribute public purchased vaccines.

8. Twenty-six (26) grantees, distributing approximately 62% of the public doses in the US (over 40 million doses per year), have contracts with a vaccine distributor. Many of these contracts expire prior to March 31, 2007. Four (4) of these contracts expire on or before December 31, 2006. This includes the state of New Jersey, whose distribution contract will expire November 30, 2006. This may result in no vaccine distribution services in New Jersey as early as December 1, 2006. It is not clear at this time if the other grantees with contracts expiring prior to December 31, 2006 will have the ability to extend existing contracts or at what costs these extensions may be provided.

9. One contract with a vaccine distributor currently serves 14 grantees, representing over 20% of the nation's public purchased vaccine distribution. It expires March 31, 2007, with no option periods for extension. This contract is not currently in the process of being renegotiated, under the assumption that these services will be replaced by the federal contract.

10. In 2003, CDC began the process of critically reviewing vaccine management at the federal, state, and local levels in order to assess current practices and develop methods and strategies to enhance this important activity.

11. This project, known as the Vaccine Management Business Improvement Project (VMBIP), was used to identify opportunities and develop solutions toward improving efficiency, accountability, and the nation's ability to respond to public health crises.

12. On November 1, 2005, the CDC issued Solicitation No. 2006-N-08248. The purpose of Solicitation No. 2006-N-08248 is to provide centralized receipt, storage and distribution of licensed vaccines purchased under separate federal supply contracts and non-federal contracts.

13. Prior to the issuance of Solicitation No. 2006-N-08248, the CDC did not have a contract in place for the centralized distribution of vaccines.

14. The goal of the solicitation is to enhance operating efficiency, improve vaccine inventory visibility and reduce operating expenses in the management and distribution of vaccines purchased with Federal funds for public use.

15. On September 12, 2006, CDC took an important step towards realizing this goal by awarding a contract that will centralize public purchased vaccine distribution for the nation.

16. This contract is the central feature of our vaccine management improvement efforts. Thousands of staff hours, both on the part of CDC and our state and local partners, have been dedicated to the task of transitioning vaccine distribution functions from existing State and local infrastructure to a centralized distributor.

17. Grantees have been working actively for a number of months to position their programs to "go live" with the centralized vaccine distributor.

18. Roll on dates have been negotiated with each grantee to build a schedule designed to address a variety of program and timing issues. These issues include managing existing contract expirations, grantee staffing transitions, and vaccine draw down in preparation for transition to the centralized vaccine distributor.

19. In addition, grantees have engaged in communications with providers and other partners, preparing them for the process changes they must make to transition to the centralized distributor. CDC has worked to keep this process of change on schedule to avoid disruptions in vaccine distribution to providers and clinics.

20. Further delaying the start-up date for the new contract will require CDC to forego the current plan of incrementally bringing immunization programs onboard. This will add an element of risk to the process and ultimately may threaten the successful transition of programs to the new distributor.

21. A disruption of the contract for centralized distribution will have a negative public health impact in several important areas.

22. First, we will not be able to fulfill our public health role of assuring vaccination of the most vulnerable children, adolescents, and adults.

23. Second, our ability to respond to public health emergencies and crises, including pandemic influenza, will be significantly compromised.

24. Third, the successful completion of this critical re-tooling of vaccine management will be jeopardized.

25. As part of planning for VMBIP, a detailed timeline was developed to allow for 64 immunization grantees to transition over to centralized vaccine distribution. This timeline allows for the necessary assessment and planning that each state will need to accomplish, based on state-specific characteristics such as current distribution type, to achieve a seamless transition.

26. CDC has developed, in consultation with state and local health departments, a schedule for immunization programs to "roll on" to centralized distribution. This schedule takes into account a number of factors including the complexity of change for each immunization program, expiration of existing distribution contracts, projected vaccine inventory, and the ability to test process changes with the new distributor and a selected group of pilot programs. Following completion of the pilot period, the schedule transfers two or three programs a week to the new distributor. CDC's original schedule assumed contract award on July 31, 2006. Actual award was made September 12, 2006 due to delays related to the ongoing contract protest. The distributor will begin shipping vaccine November 13, 2006.

27. If CDC is unable to continue working with the newly selected distributor, there will be insufficient preparation time for states to make the planned transition before their current distribution activities are scheduled to discontinue. Our data indicates that, for a number of states, there are limited options to extend current vaccine distribution contracts to accommodate additional delays in the implementation of VMBIP.

28. An additional delay would seriously impact CDC's ability to conduct pilot testing of the new process. Depending on the length of the delay, CDC could be placed in a position in which large numbers of immunization programs must be transferred to the new distributor all at once. This is due to the fact that many of the programs' distribution contracts will expire by March 31, 2007. It is unclear if these contracts can be extended. One contract, the New York Multistate Distribution Contract does not have option periods for extension. Regardless of that current vendor's willingness to enact new or extend current contracts, it is unclear if state and/or local contracting procedures will allow this to happen in the timeframes currently available.

29. Any additional delays to the implementation of the contract could require CDC to forego the current plan of incrementally bringing immunization programs onboard. This will add an element of risk to the process and ultimately may threaten the successful transition of programs to the new distributor. This is something CDC and its partners have worked to avoid. Furthermore, this will hamper CDC's ability to pilot test process

changes with selected programs and make adjustments before applying these changes to other programs. This adds more risk to the process and undermines more than two years of preparation work by CDC and its partners. Introducing the new process without pilot testing will be unacceptable to many of CDC's partners.

30. Many state and local health departments have been working with providers in their jurisdictions for more than one year in order to prepare for the transition. This work is based on the relationships these programs have built with their providers. Programs have communicated to CDC the difficulty created by shifting proposed start dates. The delays cause uncertainty which negatively impacts the relationship between the immunization program and the provider. Ultimately, the credibility of the project is damaged by shifting start dates.

31. As a result, CDC must assume March 31, 2007 is a firm date by which a significant number of programs must have completed the transition to the new distributor or be left without vaccine distribution services.

32. Any additional delays could mean that CDC will be unable to assure uninterrupted vaccine distribution to the providers serving the most vulnerable populations in those states. Decreased vaccination coverage, particularly when it occurs among people living in the same geographic location, increases the likelihood of outbreaks of vaccine preventable diseases.

33. As illustrated by the extensive mumps outbreak among college students in the Midwestern part of the United States during the winter and spring of this year, our nation is still very much at risk for vaccine preventable diseases unless high vaccination coverage is sustained.

34. High vaccination coverage cannot be achieved or sustained without ready access to recommended vaccines each and every time a child accesses the health care system.

35. Research has demonstrated that missed opportunities, when a child presents for health care and is due to receive a vaccine but is not vaccinated, are one of the most important causes of low immunization coverage.

36. Previously, many missed opportunities occurred among vulnerable children when their parents were referred to the local health departments because they were unable to afford vaccination services in their provider's office.

37. These missed opportunities resulted in low vaccination coverage among US preschool children that led to the measles outbreaks (including more than 55,000 cases and 123 deaths) during 1989-1991.

38. In the aftermath of these outbreaks Congress created the Vaccines for Children Program to bring public purchased vaccines into public and private health care settings,

so that our most vulnerable children could be vaccinated and missed opportunities for vaccination would be reduced.

39. When vaccination coverage is incomplete, particularly among children living in the same geographic area, the risk of outbreaks of vaccine-preventable diseases is increased. This puts a number of individuals at risk of infection, including the unvaccinated children themselves, the community in which they live, and individuals in the community who cannot be vaccinated due to medical problems (such as HIV infection) and depend upon a high level of vaccination in the community in order to protect them.

40. A second important public health impact is our decreased ability to respond to public health emergencies and crises.

41. One of the important benefits of centralized distribution for CDC is that it increases our visibility of approximately half of the nation's vaccine supply, enhancing our ability to manage natural disasters and vaccine supply shortages/disruptions. In addition, the visibility that centralized vaccine ordering and distribution provide have made VMBIP an important platform upon which our planning for pandemic influenza vaccine ordering and distribution rest.

42. In the event of a natural disaster such as a hurricane, a centralized vaccine inventory allows us to get vaccine quickly to where it is needed most to serve persons impacted by the disaster as well as the emergency responders called in to help. During Hurricane Katrina, we were able to get to vaccine to affected states through phone calls to other states, but the time required to make these inquiries, arrange for vaccine to be borrowed, and then identify transportation was a significant challenge in managing this public health emergency.

43. Over the past six years, the nation has been beset by a large and unprecedented number of vaccine supply shortages. Between late 2000 and the spring of 2003, for example, the US experienced shortages of vaccines against 8 of 11 preventable disease in children. In addition, there have been shortages or delayed distribution of influenza vaccine for five of the past six years. Managing vaccine shortages requires substantial public health action at the federal, state, and local levels to ensure that scarce vaccine resources are distributed as equitably as possible and that vaccines are targeted to high risk patients as appropriate. Our experience in dealing with these shortages has shown us that visibility of vaccine distribution and the ability to direct vaccine distribution centrally are the two most critical tools for public health in the setting of a vaccine supply disruption. Because it provides both, VMBIP was designed to be an essential component of CDC's response to public health emergencies and crises. A delay in our ability to implement centralized distribution diminishes our ability to address disruptions in the US vaccine supply.

44. Over the past year, there has been substantial work carried out by Federal, state and local governments to develop influenza pandemic preparedness plans. Among CDC's responsibilities related to vaccination are the development of plans for allocation and distribution of pandemic vaccine to state and local public health jurisdictions. Because the vast majority (if not all) pandemic influenza vaccine will be purchased by the federal government, VMBIP has been identified as the appropriate tool to support pandemic influenza vaccine ordering, distribution, and tracking. The Vaccine Ordering and Distribution System (VODS) application, including specialized functionality related to pandemic influenza vaccine, is currently being developed for VMBIP and will be integrated into the information systems capabilities of the distributor awarded the contract for centralized distribution. Because of the unpredictability of influenza viruses, there is no way to know when our pandemic preparedness activities will be needed to protect the US population, but there is a great priority on developing the methods and tools needed to manage such a catastrophic public health event as quickly as possible. A delay in our ability to assure a workable system for the ordering and distribution of pandemic influenza vaccine leaves our nation unacceptably vulnerable.

45. If this Court's decision were to re-impose the stay, the CDC would have to forgo the benefits of centralized distribution, including a smaller inventory with less risk of vaccine lost or wastage, visibility into the location of vaccine across the United States, and the ability to redirect vaccine as needed to manage shortages or natural disasters.

46. The CDC's inability to implement centralized distribution translates into a major deficiency for pandemic preparedness because the re-tooled vaccine ordering and distribution system is the basis for the distribution of pandemic influenza vaccines. This is an unacceptable vulnerability for the United States.

Under penalty of perjury, I declare that the above facts are true and accurate to the best of my knowledge and understanding.

EXECUTED this 17th day of October, 2006, at Atlanta, GA.

Jeanne Santoli

Jeanne Santoli